Johnnie A. WILKES, Plaintiff,

v.

BOROUGH OF CLAYTON; Jane Doe, Individually and as the female officer conducting the strip search; Frank Winters, Individually and as the Chief of Police Department; Matthew McDonald, Individually and as the arresting officer, Defendants.

Civ. A. No. 86–3760.

United States District Court,
D. New Jersey.

Sept. 29, 1988.

Christopher C. Cona, Woodbury, N.J., for plaintiff.

Susan Dignam Colatsky, White and Williams, Westmont, N.J., for defendants.

## OPINION

GERRY, Chief Judge.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by the plaintiff, Johnnie Wilkes, against the Borough of Clayton, New Jersey, and Frank Winters, Chief of Police for the Borough of Clayton, and two Clayton police officers, Matthew McDonald and Jane Doe (a female officer later identified as Officer Jeanette Duffy).

This suit arose out of a sequence of events which occurred during the early morning hours of May 5, 1985. The essential aspects of the events are undisputed. As plaintiff was driving through Clayton on her way to her home in Philadelphia, she was stopped by Officer McDonald. Officer McDonald told Ms. Wilkes that her car had been swerving and asked her to perform several sobriety tests, including a breathalyzer test. Ms. Wilkes complied with respect to several of the tests; however, she refused to take the breathalyzer test.

Upon her refusal, Officer McDonald arrested Ms. Wilkes and took her to the Clayton Police Station. At the station, Ms. Wilkes continued to refuse to take the breathalyzer test. She was charged with driving under the influence (N.J.S.A. 39:4–50), refusal to take a breath test (N.J.S.A. 39:4–50.4a), careless driving (N.J.S.A. 39:4–97), and disorderly conduct (N.J.S.A. 2C:33–2(a)(2)).[1]

While at the station, Ms. Wilkes, who was menstruating, asked Officer McDonald for permission to use the bathroom so she could change her sanitary napkin. Officer McDonald allowed Ms. Wilkes to go to the bathroom but informed her that she would have to be accompanied by a female officer, defendant Jane Doe (Jeanette Duffy). This was consistent with the Borough of Clayton's policy of visual observation, by officers of the same sex, of *all* persons in police custody using bathroom facilities.

Officers Duffy and McDonald accompanied Ms. Wilkes to a small bathroom in the station. While Officer McDonald remained in the hallway, Officer Duffy followed Ms. Wilkes into the unoccupied bathroom. Once inside, Officer Duffy stood in the open doorway of the bathroom. Officer Duffy refused to allow Ms. Wilkes to close the bathroom door and refused to turn her back while Ms. Wilkes attended to her personal hygienic requirements. Instead, Officer Duffy maintained visual observation while Ms. Wilkes removed her clothing and changed her sanitary napkin. At no time, however, did Officer Duffy physically touch Ms. Wilkes, nor did any of the defendants ask Ms. Wilkes to remove any article of clothing for the purpose of inspecting or viewing her body.

On September 25, 1986, Ms. Wilkes filed a complaint with this court, claiming that Officer Duffy's visual observation was an unreasonable "strip search" and invasion of privacy violative of Ms. Wilkes' rights under the Fourth, Fifth, Ninth and Fourteenth Amendments and the New Jersey Strip Search Act, N.J.S.A. 2A:161a–3, *et seq.* The complaint sought, *inter alia,* a declaratory judgment that the Borough's blanket policy of visual observation of detainees using bathroom facilities violated the New Jersey Strip Search Act; a preliminary and permanent injunction restraining defendants from engaging in strip or body cavity searches without probable cause upon custody for non-criminal or traffic offenses; and compensatory and punitive money damages.

Defendants brought a motion for summary judgment and dismissal of the punitive damages claim. On September 22,

---

1. Plaintiff pled guilty to the charge of refusal to take a breath test. The State dismissed the careless driving and driving under the influence charges. Plaintiff was initially found guilty of disorderly conduct. This verdict was reversed on appeal and a not guilty verdict was entered in her favor. (Joint Final Pretrial Order at 5–6.)

1987, this court denied the motion for summary judgment as to plaintiff's constitutional claims, with prejudice as to the Borough of Clayton, and without prejudice as to the other individually named defendants. We granted defendants' motion as to plaintiff's claim under the New Jersey Strip Search Act, on the ground that the Act had not taken effect when the incident in the Clayton Police Station occurred. We also denied without prejudice plaintiff's claim for punitive damages.

On December 16, 1987, this court granted defendants' motion for summary judgment as to plaintiff's claim against defendants Winters, Doe and McDonald in their individual capacities on the basis of qualified immunity. In so ruling, we based our decision on the absence of any clearly established constitutional right of arrestees in police custody to be free from visual observation while using bathroom facilities. Defendants' motion for summary judgment as to plaintiff's suit against Winters, Doe and McDonald in their official capacities was, however, denied.

Before this court presently are cross-motions by the plaintiff and the defendants for summary judgment as to plaintiff's underlying constitutional claim. F.R.Civ.P. 56(c) states that summary judgment may be granted only when the record "show[s] that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Both the plaintiff and the defendants agree on the material facts; hence, determination of these cross-motions hinges on a question of law. For reasons explained below, we grant plaintiff's motion for summary judgment.

To evaluate a § 1983 claim, such as the plaintiff's, this court:

> must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). Defendants concede that the actions Ms. Wilkes complains of were undertaken by persons acting under color of state law. Our task thus focuses on the question of whether the defendants violated Ms. Wilkes' constitutional rights.

The plaintiff argues that the defendants' visual observation of her while changing a sanitary napkin intruded on a privacy interest protected by the Fourth Amendment. Specifically, plaintiff contends that the Borough's policy of visually observing *all* arrestees' use of bathroom facilities, without regard to the offense charged or individual circumstances of behavior and condition, is unreasonable and as constitutionally offensive as a blanket strip search policy since both necessitate an involuntary exposure of genitalia to police personnel.

The defendants' contentions in opposition are essentially twofold. First, the defendants argue that the Borough's policy of visually observing arrestees' use of bathroom facilities is not a "search" implicating the protections of the Fourth Amendment. Therefore, plaintiff's complaint is merely a plea for this court to recognize a new constitutional right, emanating from the penumbras of various constitutional provisions, to be free from supervision while in police custody. Second, even if visual observation of arrestees' bathroom use is a "search" for Fourth Amendment purposes, defendants believe that their policy and its application to Ms. Wilkes are reasonable. We will consider these arguments in turn, for they track the necessary Fourth Amendment inquiry.

To evaluate plaintiff's claim, this court must decide whether the defendants' actions intruded on interests secured to the plaintiff by the Fourth Amendment. The defendants argue that the mere observation of Ms. Wilkes while she changed her sanitary napkin was not a "search" because Officer Duffy was not looking for anything. This proposition has a certain simple appeal; upon closer examination, however, it is revealed as meritless.

■ "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). Therefore, in determining whether the Fourth Amendment is applicable to a particular act by government officials, the Supreme Court has focused not on the motive for the Government's intrusion but rather on the privacy interest asserted by the affected citizen. The appropriate inquiry is not to ask what was the object of the Government's actions (i.e., was the Government searching for something?), but rather to ask whether the affected citizen has a "constitutionally protected reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 506 (1967) (Harlan, J., concurring), *quoted* in *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed. 2d 210 (1986). This involves a two-part analysis.

First, the court must ask whether "the individual manifested a subjective expectation of privacy in the object of the challenged search?" *Ciraolo, supra.* Second, we must determine if "society is willing to recognize that expectation as reasonable?" *Id., California v. Greenwood,* —— U.S. ——, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *United States v. Jacobsen,* 466 U.S. 109, 122, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

As to the first question, it is undisputed that Ms. Wilkes clearly manifested a desire for privacy. Nor do we have much difficulty in concluding that society considers reasonable Ms. Wilkes' expectation that she would be permitted to attend in private to the very personal hygienic needs arising out of her menstruation. One strains to conjure up an activity more private than the changing of a sanitary napkin. The act itself, no less than a strip search, necessitates the exposure of the arrestee's genitalia to the observing officer; and indeed it may be the case that many women would prefer a visual strip search to the humiliation of being observed while changing a sanitary napkin or tampon.

Certainly the changing of a sanitary napkin is no less private an act than urination or defecation; moreover, the Borough's blanket policy is such as to dictate visual observation of all these acts by arrestees. And what a distinguished circuit judge has written about urinating is particularly apt in this context:

> There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation, indeed, its performance in public is generally prohibited by law as well as social custom. While individuals may choose not to urinate in private but instead to use public toilet facilities, they make this choice themselves.

*Natl. Treasury Employees Union v. Raab,* 816 F.2d 170, 175 (5th Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988).[2]

The Borough's policy exposes the most intimate of personal hygienic tasks to the close scrutiny and cold eye of a stranger. What many do not choose to reveal to the most intimate of their family and friends is instead, by Borough policy, laid open for careful scrutiny by the watchful eye of the law. Given the sanctions, both penal and social, which might attend attempts by citizens to perform these hygienic functions in public, it is indisputable that our society considers these tasks uniquely intimate and private. We hold, therefore, that arrestees may reasonably expect to defecate, urinate and change sanitary napkins or tampons

---

2. *See Capua v. City of Plainfield,* 643 F.Supp. 1507, 1514 (D.N.J.1986), ("[W]hile urine is routinely discharged from the body, it is generally discharged and disposed of under circumstances that warrant a legitimate expectation of privacy. The act itself, totally apart from what it may reveal, is traditionally private. Facilities both at home and in places of public accommodation recognize this privacy tradition. In addition, society has generally condemned and prohibited the act in public").

without direct visual observation by law enforcement officers, unless some justification for the intrusion is demonstrated.

As such, we reach the conclusion that rights secured to Ms. Wilkes by the Fourth Amendment were affected by Officer Duffy's maintenance of visual observation over her while attending to her hygienic needs. However, this does not end our inquiry. The Fourth Amendment does not prohibit all government intrusions into citizens' privacy interests, but only those intrusions found to be "unreasonable." *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

In *Wolfish*, the Supreme Court upheld a policy which subjected pretrial detainees to body cavity searches after contact visits with outside visitors. The Court held that the legitimate desire of detention officials to prevent contraband and weapons from entering a detention facility may, in some circumstances, justify such an intrusion. In so ruling, the Court explained that:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884, (citations omitted). The resolution of Ms. Wilkes' claim turns on the balance this court strikes between the interests supporting the Borough's blanket policy of visual observation and the privacy interests of Ms. Wilkes and other arrestees who wish to attend to personal hygienic needs without direct observation.

The defendants justify their across-the-board policy as necessary to protect arrestees from harming themselves and/or others while in the Borough's custody. Moreover, the defendants believe that it "is obvious that persons suspected of driving while intoxicated must be considered a potential hazard to themselves and others, and reasonable behavior cannot be assumed from them while they are in police custody." Further, if the Borough were to leave arrestees unattended while using bathroom facilities, it and its officers would be subject to liability under § 1983 if an arrestee such as Ms. Wilkes were to harm herself while using bathroom facilities. Therefore, if this court were to find the Borough's present policy unreasonable, the Borough would be subject to liability both for supervising some arrestees too closely and for failing to supervise others closely enough. This, defendants argue, would put them in an "impossible situation."

At this point, this court must make clear its view that the defendants' actions cannot be justified by reference to the specific charges for which Ms. Wilkes was arrested. Defendants concede that the plaintiff was observed pursuant to a blanket policy applied to all arrestees in custody. Whether Ms. Wilkes was arrested for driving under the influence or other charges is irrelevant since *every* arrestee is subject to constant visual oversight. It is thus the need for the Borough's across-the-board policy of constant visual observation which must be weighed in the balance, not any particular need defendants have to visually observe persons charged with the offenses for which Ms. Wilkes was arrested.[3]

On the other side of the scale, we must place the intrusion Ms. Wilkes suffered when forced to change her sanitary napkin under the watchful eye of Officer Duffy. This court, as indicated earlier, regards this as a significant intrusion on her privacy— one likely to engender shame and humiliation. Likewise we have little doubt that

---

**3.** It is significant to note that the defendants have not sought to justify Officer Duffy's observation of Ms. Wilkes on the basis that Ms. Wilkes' behavior and condition gave them suspicion, reasonable or otherwise, to believe she might harm herself or others. Indeed, though it is not a factual source upon which it need or does rely, this court has reviewed a police videotape of Ms. Wilkes filmed nearly contemporaneously with the incident which motivated this suit. On this tape, Ms. Wilkes communicates both coherently and rationally and suffers from no apparent physical impairment.

arrestees forced to defecate and urinate while being viewed by Borough police suffer a serious invasion of privacy. Few acts could be more personal; fewer still would one desire a stranger to watch.

The Borough apparently attempts to carry out its policy in the least intrusive manner possible by allowing arrestees to use a small, remote bathroom observed only by officers of the same sex. Nevertheless, the nature of the acts observed is such as to render the scope of the intrusion significant. ·

In striking the balance between the Borough's need for its present policy against its invasion of Ms. Wilkes' and other arrestees' privacy interests, we are guided by numerous decisions assessing the constitutionality of blanket strip search policies as applied to arrestees. These decisions are particularly relevant since they deal with the validity of visual strip searches not involving physical contact with the arrestee, conducted pursuant to policies calling for strip searches of all defendants regardless of the offense with which they were charged.[4]

In evaluating the validity of these policies, the courts have followed the approach advocated in *Bell v. Wolfish* and have weighed the government's interest in keeping its detention facilities free from weapons and contraband against the degradation the strip searches imposed on arrestees. After balancing these concerns, seven of the Circuit Courts of Appeal and two courts in this judicial district have held that authorities must have a "reasonable suspicion" that an arrestee is harboring contraband or weapons before a visual strip search will be constitutionally permissible. *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), *cert. denied, sub nom. County of Monroe v. Weber*, —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Jones v. Edwards*, 770 F.2d 739 (8th Cir.1985); *Stewart v. County of Lubbock*, 767 F.2d 153 (5th Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Giles v. Ackerman*,

746 F.2d 614 (9th Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984); *Marybeth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *O'Brien v. Borough of Woodbury Heights*, 679 F.Supp. 429 (D.N.J.1988); *Davis v. City of Camden*, 657 F.Supp. 396 (D.N.J.1987); *see also State v. Sheppard*, 196 N.J.Super. 448, 483 A.2d 235 (N.J.Super.L.1984). As Judge Brotman of this district has noted, reasonable suspicion is a standard which requires a particularized and objective basis for suspecting the particular person of secreting weapons or contraband. *O'Brien*, 679 F.Supp. at 433, *quoting United States v. Montoya de Hernandez*, 473 U.S. 531, 541–542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985). Factors which may lead authorities to reasonably suspect that an arrestee may be concealing such items include the crime with which she is charged, her particular characteristics, and the circumstances of her arrest. *Weber*, 804 F.2d at 802.

This court considers the Borough's policy of watching arrestees use bathroom facilities no less destructive of arrestees' rights than the visual strip searches at issue in the cases cited above. *Cf. Capua v. City of Plainfield*, 643 F.Supp. at 1514. ("The requirement of surveillance during urine collection forces those tested to expose parts of their anatomy to the testing official in a manner akin to strip search exposure"). The very imperatives of human physiology dictate that arrestees detained in Clayton for any significant period of time will have at least those areas of their genitalia necessary for defecation and/or urination exposed to the police. Without a standard at least as stringent as that which applies to strip searches, the protections *Davis* and *O'Brien* grant arrestees in New Jersey will be ineffectual.

---

**4.** We take special note of these cases, and of *Wolfish*, for another reason. *Wolfish* and its progeny consider the constitutionality of intrusive policies designed primarily to further the

security interests of detention facilities rather than to secure items of evidentiary value. Here, too, the Borough's visual oversight policy furthers security rather than investigative interests.

In the strip search cases, the courts have rejected the notion that a blanket policy was a "reasonable" way to further the government's legitimate desire to keep contraband and weapons out of its detention facilities. Rather, courts have struck the balance between the legitimate security considerations of the detaining authorities and the privacy rights of detainees by requiring not full probable cause, but some articulable basis for suspecting that a particular arrestee or class of arrestees possess concealed weapons of contraband. This court believes that the security interests of the Borough of Clayton and the privacy rights of Ms. Wilkes and other Clayton arrestees may appropriately be balanced in the same fashion.

Like the interest in preventing contraband from entering detention facilities, the Borough's interest in preventing arrestees from harming themselves or others is an important one. However, this concern does not justify the Borough's policy of observing every arrestee's use of bathroom facilities. Certainly not every arrestee in Clayton is bent on self-harm, nor are all arrestees equally likely to harm others in the station if left unsupervised.

Further, the Borough's method of supervising arrestees' bathroom use is simply not necessary to protect others in the facility from harm. It is undisputed that Ms. Wilkes was taken by Officers McDonald and Duffy to a bathroom where no other persons were present. Officer Duffy's constant presence in the bathroom simply addressed no security threat posed by Ms. Wilkes to others in the station house. For if Officer Duffy were outside the closed door, Ms. Wilkes could have harmed only one person while in the bathroom—herself.

The Borough's interest in ensuring that arrestees in its custody not be given the opportunity to harm themselves is more substantial. Assuming Ms. Wilkes and other arrestees are searched for weapons, knives and other instruments with which they may harm themselves, however, actual visual observation of arrestees' use of bathroom facilities adds relatively little to the Borough's efforts to prevent suicide attempts.

In Ms. Wilkes' case, she was personally escorted to the bathroom by Officers McDonald and Duffy. Whether Officer Duffy actually observed Ms. Wilkes change her napkin or remained right outside the bathroom door is relatively insignificant as measured by its deterrent effect on Ms. Wilkes' ability to harm herself, but the distinction is essential from the perspective of Ms. Wilkes' expectation of privacy. And even if actual optical oversight of arrestees' bathroom use would be more effective than mere presence outside the bathroom, this court believes that the Borough's interest in preventing arrestee self-harm does not justify the imposition of this degrading oversight procedure on every person arrested in Clayton.

The seriousness of the intrusion on Ms. Wilkes and other Clayton arrestees is such as to necessitate some reasoned criteria for determining which arrestees pose such a threat of self-harm that they must be observed while using bathroom facilities. The Borough asks this court to permit its police to continue to visually monitor the very private hygienic acts of every arrestee in Clayton, irrespective of their behavior, emotional and physical condition, or the offenses with which they are charged.

■ Such a policy is simply unreasonably intrusive, as measured by the interests it was designed to serve. As in the strip search context, this court believes that the Fourth Amendment forbids the Borough and its police from visually observing arrestees using bathroom facilities unless the police have a reasonable suspicion that an arrestee will harm herself if allowed to defecate, urinate, or change a sanitary napkin or tampon behind a closed stall or bathroom door. Only when an arrestee's behavior, emotional or physical condition, or past record of self-harm are such as to engender a reasoned and articulable basis for maintaining direct visual oversight at all times is a viewing of an arrestee's bathroom use constitutionally

justifiable.[5]

■ This, of course, does not mean that the Borough must allow arrestees to use bathroom facilities without restriction or supervision. We simply hold that the Borough's present policy of subjecting every arrestee to the humiliation of visual oversight while using bathroom facilities is unreasonable, and that the application of this policy to Ms. Wilkes deprived her of rights secured to her by the Fourth Amendment of the United States Constitution.

As this deprivation was caused by the implementation of a Borough policy, under § 1983, the defendant Borough, and its defendant officers in their official capacities, are liable to Ms. Wilkes. Summary judgment is therefore entered in favor of the plaintiff. The accompanying order has been entered, and a hearing to determine appropriate relief will be scheduled.

ADJUDGED AND ORDERED that judgment is entered in favor of plantiff and against defendants.

---

**5.** The defendants' argument that a ruling for plaintiff would place the Borough in an "impossible" situation is baseless. Requiring attending officers to maintain supervision by standing immediately outside a closed bathroom or stall door imposes no greater burden on the Borough than does its policy of direct visual observation. Moreover, the cases cited by the defendants to support the proposition that the Borough and its officers would be subject to § 1983 liability if an unobserved arrestee was to harm herself in the bathroom are simply so factually distinguishable as to have little bearing on this case. In *Holland v. Breen*, 623 F.Supp. 284 (D.Mass. 1985), a § 1983 cause of action was held to be stated where an arrestee hanged himself while left unattended in a holding cell. However, the decedent had been arrested because he was so intoxicated as to pose a danger to himself; had been beaten severely about the head, face and shoulders by police officers; and was placed in the cell without receiving medical treatment for injuries suffered in the beating.

In *Madden v. City of Meriden*, 602 F.Supp. 1160 (D.Conn.1985), a § 1983 cause of action was again held to be stated in the case of an arrestee who hanged himself while in police custody. In *Madden*, it was alleged that the police: knew the arrestee suffered from serious psychological impairments and had attempted self-injury; had beaten the arrestee brutally causing him to suffer a fractured skull, a hematoma, and other serious injuries; had placed the arrestee in a cell without providing him with medical treatment; removed none of the objects in the cell which could facilitate suicide despite knowledge of arrestee's past suicide attempts; and failed to maintain any visual or audio monitoring of the arrestee while in the holding cell.

The citation of these cases as relevant to the potential § 1983 liability the Borough and its officers might incur if arrestees are permitted to use bathroom facilities behind a closed stall or bathroom door fails the straight-face test.